UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CATHY LOUISE MANEY,

                              Plaintiff,                    No. 04-CV-6480 CJS(P)

        -vs-

                                                           DECISION AND ORDER

CORNING, INC. and supervisor
PHILLIP HUBER as aider and abettor,

                              Defendants.

_____

APPEARANCES

For plaintiff:              Kevin P. Flynn, Esq.
                           447 Fulton Street, Suite 200
                           Waverly, New York 14892

For defendant Corning, Inc.:   Jill K. Schultz, Esq.
                           Piper Schultz LLP
                           The Powers Building, Suite 730
                           16 W. Main Street
                           Rochester, New York 14614

For defendant Phillip Huber:   Scott D. Moore, Esq.
                           Moore, Woodhouse & Pawlak, LLP
                           150 Lake Street
                           Elmira, New York 14901

INTRODUCTION

        This is an action alleging employment discrimination pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the

New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.*  Now before the

Court are defendants' motions for summary judgment. (Documents [#23][#27]).  For the

1

reasons that follow, the applications are granted in part and denied in part.

BACKGROUND

Unless otherwise noted, the following are the facts of this case, viewed in the light most favorable to plaintiff Cathy Louise Maney ("Plaintiff").  Plaintiff was employed as an "Operations Associate" at defendant Corning's Photonics Plant in Corning, New York, for approximately ten months, between February 2000 and November 2000.  In or about March 2000, Plaintiff was assigned to work in Corning's "Measurements Group," which was located in the section of the Corning Plant designated as  H 132.  Plaintiff's supervisors in the Measurements Group included Ian McLaughlin ("McLaughlin"), Domenic DiNardo ("DiNardo"), and Patricia Cronin ("Cronin").

Defendant Phillip Huber ("Huber") was a Corning employee who also worked in H 132, though he was not a member of the Measurements Group.  Plaintiff alleges that in or about April 2000, Huber began to harass her in a variety of ways.  Huber asked Plaintiff to unbutton her lab coat, and also told her that he "could not wait for it to be weekends [when he and Plaintiff worked 12-hour shifts] so he could stare at [her] legs for 12 hours." (Plaintiff's 1/25/06 Deposition at 43).  Huber made such comments "numerous times." (*Id*. at 45).  Although Plaintiff did not initially report these comments to a supervisor, she discussed them with co-workers, who witnessed the comments, and who told her that the comments were "normal behavior" for Huber.

Subsequently, Huber repeatedly entered Plaintiff's work area to use a telephone located directly behind her chair, even though there were numerous other telephones available in the area, and, while using the telephone, placed his feet against the back of Plaintiff's chair, pinning her against the table at which she was working.  Plaintiff asked

2

Huber to stop this behavior each time it occurred, and he responded by laughing. (*Id*. at 48-49).  After being pinned in this manner by Huber on several occasions, Plaintiff reported the incidents to DiNardo.  DiNardo spoke to Huber, but Huber continued as before. (*Id*. at 50).  Huber also repeatedly bumped[1] into Plaintiff, demanded her to tell him her age, and commented that she "liked working over here with her boys," referring to her male co-workers in the Measurements Group. (*Id*. at 47-48, 52-55).

On or about June 26, 2007, Huber, who had just been elevated to the position of probationary supervisor, approached Plaintiff during her shift, and told her that he needed her to help him clean the plant floor.[2]  When Plaintiff refused, Huber responded, "What do you do, have your kids do all your work at home?"  Huber then again asked Plaintiff her age.  Huber then said, "What do you want to do?  What[,] you want to stay over here with your boys?  What are you doing anyhow with your boys, playing hoochie mama?" (Plaintiff's 1/25/06 Deposition at 56-58).  Plaintiff immediately reported Huber's actions to DiNardo and Cronin.  Later during that shift, Plaintiff received a personal phone call from her daughter, and Huber told her that she would have to take the call somewhere else, despite the fact that the phone that Huber told her not to use was generally available to anyone.  Still later during that shift, Huber hid around a corner from Plaintiff, observing

---

[1]Corning denies that Plaintiff ever complained of Huber bumping her prior to this lawsuit.  During oral argument of the subject motions, Corning's counsel indicated that because Plaintiff did not specifically allege bumping in her EEOC complaint or her complaint in this action, the bumping claims are time-barred.  However, that argument is not contained in Corning's summary judgment motion papers, and is therefore not before the Court.

[2]Corning denies that Huber was ever promoted to supervisor.  However, Huber indicates that on June 25, 2000, Corning advised him that he "was being promoted to supervisor," and that he was "a probationary supervisor for one day," but that Corning subsequently denied him that promotion because of Plaintiff's complaint. (Huber Affidavit ¶ ¶ 3-4; Huber Memorandum of Law at 2).  The Court must view the evidence in the light most favorable to Plaintiff.

her returning from a break, and then told her that he could have her fired for wearing her "heel straps"[3] during her break. (*Id*. at 68-73).  Plaintiff again reported Huber's actions to DiNardo and Cronin. (*Id*. at 73, 103).  Cronin responded, "This is sexual harassment, and you need to report this to the HR Department immediately." (*Id*. at 99-100).[4]

When Plaintiff's shift ended, she and McLaughlin went to Corning's Human Resources Office and reported Huber's actions. (*Id*. at 90, 104).  Plaintiff described all of Huber's harassment during the period leading up to that day. (*Id*. at 104).  Plaintiff stated that she was worried about retaliation, but was told not to worry. (*Id*. at 105).  Corning investigated Plaintiff's complaints and terminated Huber's employment one or two days later.[5]  According to plaintiff, a Corning Human Resources Staff Member told her, during a meeting with her and various supervisors, that Huber "admitted to the complaint" and that "his job was terminated." (*Id*. at 119, 121).  Subsequently, another supervisor told Plaintiff that Corning was "very well aware" that Huber had harassed other women.[6]

However, on or about July 26, 2000, Corning informed Plaintiff that it was reinstating Huber.  According to Corning, Huber's labor union filed a grievance, and Corning and the union subsequently reached an agreement, under which Huber was

---

[3]Heel straps were part of the clothing that Corning employees were required to wear.

[4]At all relevant times Corning had a written Harassment Policy, indicating that the company had a "zero tolerance policy against harassment of any kind," including harassment because of sex, and directing employees who had experienced harassment to report it to any one of a number of persons, including "Supervisor," "Plant Personnel Supervisor," or  "Human Resource Manager/Consultant." (Metcalf Affidavit [#27], Ex. 2).

[5]Corning contends that Huber's employment was only suspended, not terminated.  However, Plaintiff maintains that Corning officials told her that Huber was terminated.

[6]Plaintiff's 1/25/06 Deposition at 113 ("Dort Burton, for one thing, was a supervisor of mine and she told me – in fact she told me separately, but she told me also with Mr. Arena that they were very well aware that 'Mr. Huber has been – has done this to many women,' were her words.").

reinstated in a non-supervisory position and placed on probation for five years.  The

agreement specified, *inter alia*, that Huber would "be a role model in Diversity and

Preventing Harassment," but contained no reference to Plaintiff or any requirement that

Huber avoid contact with her.  Nevertheless, a Corning Human Resources Manager

assured Plaintiff that Plaintiff and Huber "would not have interaction with one another."

(Plaintiff's 1/25/06 Deposition at 127; 131).

Corning subsequently assigned Huber to work a shift that was opposite Plaintiff's

shift.  However, Corning permitted Huber to work overtime on Maney's shift. (Metcalf

Affidavit ¶ 10).  Subsequently, on approximately three or four occasions, between

September and November 2000, Huber worked overtime during Plaintiff's shift, and

selected a work area a few feet away from Plaintiff's, even though it was not where he

was assigned to work.[7] (Plaintiff's 1/25/06 Deposition at 171-72).  On these occasions

Huber stared and leered at Plaintiff.  On two or three of these occasions, Huber also

bumped into Plaintiff and blocked her path as she was attempting to walk. (*Id*. at 132-34,

187).  Plaintiff indicates that after bumping her, Huber would smirk and/or say, "I didn't

see you there." (Plaintiff 3/31/06 Deposition at 5).  Huber's actions caused Plaintiff to feel

fearful and to experience panic attacks.

Plaintiff told DiNardo, Cronin, and several other supervisors, that Huber was

---

[7]Plaintiff's 1/25/06 Deposition at 131 ("[H]e came and signed up on overtime to be work deployed in one area of the plant, which was, you know, quite a distance from me.  And then when he came to work, he would place himself about the distance that you and I are at, and work in that area where he was not deployed to work.").

staring and leering at her.[8]  All of the supervisors told Huber to leave the area. (Plaintiff's

3/31/06 Deposition at 6-16).  Huber, though, refused, and indicated that he had spoken

with his union and that he had the right to be where he was.  Ultimately, Corning

permitted Huber to continue working near Plaintiff, and in this lawsuit, Corning contends

that Huber's presence near Plaintiff's work area was not improper. (Metcalf Affidavit [#27]

¶  11) ("[S]ince Huber's return from his suspension, Maney did not complain about any

inappropriate conduct by Huber or anyone else.  The only complaints I was aware of

concerned Mr. Huber's presence which, as I understood it, was not wrongful.") (emphasis

in original).[9]

        Huber admits that, after his employment was reinstated, he sought out

opportunities for "overtime or work adjacent to Maney, which occurred on several

occasions." (Huber Memo at 6).  Additionally, Huber admits that on those occasions

Plaintiff complained to her supervisors. Id.  Huber further admits that Plaintiff's

supervisors told him to remove himself from the area near Plaintiff, and that he refused,

because he was not "doing anything to harass Maney." Id.  Specifically, Huber maintains

that he "took no inappropriate action toward Plaintiff Maney and specifically denies that

he leered at her, watched her or bumped into her." (Huber Affidavit ¶ 10).

--------

[8]Plaintiff assumes, but is not certain, that she also told her supervisors at Corning about Huber
blocking her and bumping into her, because she routinely told them about Huber's actions. (Plaintiff's
1/25/06 Deposition at 132-34). Plaintiff is certain that she discussed the fact that Huber was blocking her
path and bumping into her, with Jerry Arena ("Arena"), her supervisor at the temporary employment
agency through which she was working for Corning.  On November 2, 2000, Arena met with Corning's
Human Resources Office to discuss Huber's continuing harassment of Plaintiff. (Plaintiff's 125/06
Deposition at 132-34, 137-145).  However, it is unclear whether Plaintiff discussed the bumping incident
with Arena prior to the termination of her employment on November 30, 2000. (Plaintiff's 3/31/06
Deposition at 92-93).

[9]Corning does not explain why, if that is true, numerous supervisors told Huber to leave the area.

On or about November 21, 2000, Plaintiff injured her shoulder at work (Plaintiff's 3/31/06 Deposition at 49), and was placed on medical leave for five days.  Plaintiff returned to work, with the restriction that she not lift more than 12 pounds. (Plaintiff's 1/25/06 Deposition at 136).  On November 30, 2000, Corning informed Plaintiff that it was terminating her employment, due to her physical restriction, and Plaintiff never returned to work at Corning. (*Id*. at 137).[10]

Plaintiff commenced the subject action on October 5, 2004, alleging claims for hostile work environment sexual discrimination and "retaliation/wrongful termination," under both Title VII and the NYHRL.  Following discovery, Corning and Huber filed the subject motions for summary judgment.[11]  Corning contends that it is entitled to summary judgment because Huber's conduct was not sufficiently severe or pervasive to amount to actionable sexual harassment.  Corning argues, for example, that Huber's repeated act of pinning Plaintiff's chair with his feet "did <u>not</u> involve him physically touching her in any way." (Corning Memo at 5) (emphasis in original).  Corning further contends that "leering" and calling a female a "hoochie mama" are insufficient to create a hostile environment.  Corning also maintains that Plaintiff has failed to demonstrate a constructive discharge.  Huber contends that he is entitled to summary judgment on Plaintiff's Title VII claims, because that statute does not provide for liability against individual employees.

---

[10]Corning's counsel denies that Corning terminated Plaintiff's employment, and contends that Plaintiff quit.  However, Corning has not submitted evidentiary proof in admissible form concerning the circumstances under which Plaintiff ceased working.

[11]After the motions were briefed, the parties requested that the Court hold the motions in abeyance while they conducted settlement negotiations.  Approximately six months later, the parties, having been unable to reach a settlement, asked that the motions be placed back on the Court's motion calendar.

Additionally, Huber contends that he cannot be held primarily liable under NYHRL § 296(1), since he has no ownership interest in Corning, and that he cannot be held liable as an aider and abettor under NYHRL § 296(6), since he allegedly acted alone. Alternatively, he contends that if the NYHRL § 296(1)  claims against Corning are dismissed, then the Court must also grant summary judgment to him on the § 296(6) claim.  In that regard, Huber joins in Corning's contention that the alleged harassment was not sufficiently severe or pervasive to qualify as actionable sexual harassment. Plaintiff concedes that Huber cannot be held liable under Title VII, but otherwise opposes Defendants' applications.

Counsel for the parties appeared before the undersigned for oral argument on December 6, 2007.  The Court, having thoroughly considered the parties' written submissions and the arguments of counsel, now grants Defendants' applications in part, and denies them in part.

## ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In

moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(citations and internal quotations omitted).  However, a plaintiff may not defeat a

motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829.

*Title VII and the NYHRL*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006). However, "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (citation omitted).

Generally, "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert den*. 522 U.S. 997 (1997). Consequently, unless otherwise noted, references to Title VII below are also intended to refer to the NYHRL. An exception to this general rule is that individual defendants may be held liable under the NYHRL, but not under Title VII. Specifically, "[u]nlike Title VII, [NY]HRL § 296(6) has been construed by the Second Circuit to impose liability on an individual 'defendant who actually participates in the conduct giving rise to a discrimination claim.'" *Lewis v.*

10

*Triborough Bridge and Tunnel Auth.*, 77 F.Supp.2d 376, 380 (S.D.N.Y. 1999) (*citing*

*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by*

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

Under NYHRL § 296(6), an individual co-worker may be held liable as an aider and

abettor, assuming that the employer is found liable under § 296(1).  In this regard, the

individual defendant, who may have personally committed the discrimination, is not held

liable for aiding and abetting his own actions, but instead, is deemed liable for aiding and

abetting the primary violation by the employer. *Bennett v. Progressive Corp.*, 225

F.Supp.2d 190, 214 n. 11 (N.D.N.Y. 2002).  Another difference between Title VII and the

NYHRL is that, "courts have applied a stricter standard under the state and local human

rights laws with regard to the imputation of liability to an employer, requiring that the

employer encourage, condone, or approve of the conduct." *International Healthcare*

*Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F.Supp.2d 345, 361 (S.D.N.Y. 2007)

(citations omitted).

*Hostile Environment*

To establish a hostile work environment claim, a plaintiff must show that

the harassment was sufficiently severe or pervasive to alter the conditions
of the victim's employment and create an abusive working environment.
The plaintiff must show that the workplace was so severely permeated with
discriminatory intimidation, ridicule, and insult that the terms and conditions
of her employment were thereby altered.  Proving such a claim involves
showing both objective and subjective elements: the misconduct shown
must be severe or pervasive enough to create an objectively hostile or
abusive work environment, and the victim must also subjectively perceive
that environment to be abusive.

In addition, the plaintiff must show that a specific basis exists for imputing
the objectionable conduct to the employer. Where an employee is the victim

of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.  According to two 1998 Supreme Court cases, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), this inquiry differs where the harassment is attributed not to non-supervisory co-workers but to a supervisor with immediate or successively higher authority over the employee. *Burlington Indus.*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In that circumstance, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee.  If it did, the employer will, ipso facto, be vicariously liable.  If no such tangible employment action is present, however, an employer will still be liable for a hostile work environment created by a supervisor unless the employer successfully establishes an affirmative defense.  That defense requires the employer to show that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Fairbrother v. Morrison*, 412 F.3d 39, 48-49 (2d Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).[12]

The law to be applied when considering whether conduct was sufficiently severe and pervasive is well settled:

Although isolated incidents ordinarily will not rise to the level of a hostile work environment, even a single incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment. The matter of whether the conduct alleged was so severe or pervasive as to create an objectively hostile or abusive work environment, is to be decided based on the totality of the circumstances, in light of such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

---

[12]As discussed above, the standard for imputing liability to an employer is different under Title VII than under the NYHRL.

> unreasonably interferes with an employee's work performance. Where reasonable jurors could disagree as to whether alleged incidents of . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law.

*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (citations and internal quotations omitted).

### Retaliation

To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations and internal quotations omitted). It is well settled that "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Id.* at 566. In deciding whether a particular activity amounts to "protected activity," "the employment practices opposed by the plaintiff need not have actually amounted to a violation of Title VII. Rather, the plaintiff must have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001).

To make a prima facie showing of an adverse employment action, the plaintiff must show that the employer's actions caused a materially adverse change in the terms and conditions of employment. In this regard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this

13

context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc. Servs.*,  461 F.3d at 207 (*quoting  Burlington N. & Santa Fe Railway Co. v. White*, --- U.S. ----, 126 S.Ct. 2405, 2415 (2006)).  Moreover, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id*. at 209.

Retaliation claims are analyzed using the three-tier burden-shifting test "set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny." *Valentine v.Standard & Poors*, 50 F.Supp.2d 262, 281-82 (S.D.N.Y. 1999)(Citations and internal quotations omitted), *aff'd*, 205 F.3d 1327 (2d Cir. 2000); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), *cert den.* 534 U.S. 993 (2001).  Under the first tier of the *McDonnell Douglas* test, the plaintiff must establish a prima facie case.[13]  If the plaintiff establishes a prima facie case,

> the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge [or other adverse employment action].  At this stage, the employer need only articulate--but need not prove-- the existence of a nondiscriminatory reason for its decision. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.  Once defendant meets its burden of production, the burden shifts back to plaintiff. Under the third tier of the *McDonnell Douglas* test, plaintiff bears the ultimate burden of proving that the reason proffered by the employer is a pretext for unlawful discrimination.  In order to survive a motion for summary judgment, plaintiff

---

[13]It is clear that "the burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion as the prima facie stage is *de minimis*." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (emphasis in original, citation and internal quotation marks omitted).

> must establish a genuine issue of material fact as to whether the employer's reason . . . is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Valentine*, 50 F.Supp.2d at 281-82 (Citations and internal quotations omitted); *see also,*

*Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003).

At the third tier of the McDonnell Douglas test, simply proving that the employer's

proffered reason was false may, or may not, establish the required proof of discriminatory

intent:

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (*quoting Reeves v.*

*Sanderson Plumbing Prods. Inc.*, 120 S.Ct. 2097, 2108-09 (2000)). In this regard, "[t]he

relevant factors . . . include the strength of the plaintiff's prima facie case, the probative

value of the proof that the employer's explanation is false, and any other evidence that

supports or undermines the employer's case." *Id.* (internal quotation marks omitted).

Applying the foregoing applicable principles of law to the facts of this case, the

Court finds, first, that Defendants are not entitled to summary judgment on the hostile

work environment claims, under Title VII or the NYHRL, since there are triable issues of

fact. The Court finds, for example, that there are triable issues of fact as to whether

Huber committed the alleged harassment, and if so, whether the alleged harassment was

sufficiently severe or pervasive. The Court also finds that there are triable issues of fact

as to whether Corning took appropriate remedial action, and as to whether Corning

encouraged, condoned, or approved of Huber's alleged conduct.

On the other hand, the Court agrees that Defendants are entitled to summary judgment on Plaintiff's "retaliation/wrongful termination" claim. Although Plaintiff refers to "constructive termination[14]," she maintains that Corning actually terminated her employment, therefore she cannot maintain a constructive discharge claim.[15] Neither can Plaintiff establish a retaliation claim based on the termination of her employment. Plaintiff's papers contain no discussion of the elements of such a claim, however, the Court will assume, for purposes of this decision, that Plaintiff can establish a prima facie case of retaliation, relying upon temporal proximity to establish the necessary causal nexus between her complaint and the termination of her employment. The Court also finds that Corning has proffered a non-discriminatory reason for terminating Plaintiff's employment, which is that she could not perform the job due to the physical limitations set by her physician.[16] However, Plaintiff has not come forward with any evidentiary proof in admissible form to show both that this reason is false and that the real reason Corning terminated her employment was retaliatory animus. Consequently, Defendants are entitled to summary judgment on the "retaliation/wrongful termination" claim.

---

[14]Complaint ¶ 32.

[15] *See, Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) ("A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.")(Citations and internal quotation marks omitted).

[16]Although Corning denies that it terminated Plaintiff's employment, the Court must view the facts in the light most favorable to Plaintiff, who insists that Corning terminated her employment on November 30, 2000, due to the physical limitations set by her doctor.

CONCLUSION

For the foregoing reasons, Defendants' motions [#23] [#27] are granted in part and denied in part.  Defendants' are granted summary judgment on Plaintiff's "retaliation/wrongful termination" claim, and their motions are otherwise denied.  By separate Order the Court will schedule a Pre-Trial Conference.

SO ORDERED.

Dated: Rochester, New York
     December 11, 2007

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge